UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CECIL DUDGEON,

                            Plaintiff,

        v.

KELLY CUNNINGHAM, CAREY
STURGEON, MELISSA SOHLSTROM,
and JOSEPH MITROVICH,

                            Defendants.

No. C10-5372 RBL/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  September 2, 2011**

Plaintiff Cecil Dudgeon is civilly committed as a sexually violent predator to the Special

Commitment Center (SCC) pursuant to Wash. Rev. Code 71.09.  Mr. Dudgeon claims that

Defendants Kelly Cunningham, Carey Sturgeon, Melissa Sohlstrom, and Joseph Mitrovitch

(collectively "SCC Defendants") violated his civil rights when they denied him access to a

calendar containing family photographs.  ECF No. 1.  He seeks a permanent injunction enjoining

the SCC Defendants from interfering or depriving him of full access to his mail.  *Id.*, p. 13.  On

May 25, 2010, Mr. Dudgeon filed a motion for preliminary injunction asking this Court for an

Order enjoining Defendants "from further unwarranted censoring of Plaintiff's incoming mail,

including family photographs."  ECF No. 2.  The Court denied the motion.  ECF No. 21.  That

decision was affirmed by the Ninth Circuit Court of Appeals affirmed the denial.  ECF No. 44.

Presently before the Court is Defendants' Motion for Summary Jjudgment.  ECF No. 46.

In response, Plaintiff has filed a "Certification of Objections."  ECF No. 47.  Defendants have

REPORT AND RECOMMENDATION- 1

replied. ECF No. 48. Having carefully reviewed the motion, briefs in opposition, and summary judgment evidence, the Court recommends that the motion for summary judgment be granted.

### STATEMENT OF FACTS

On February 2, 2010, Mr. Dudgeon received an "8 ½ by 11-inch booklet style calendar prepared and sent to him by a member of his immediate family." ECF No. 1, p. 5. The booklet contained a calendar for each month of the year 2010, with a collage of computer generated photographs of family members on the facing pages. *Id.* Mr. Dudgeon's daughter states that she created family calendars for the past few years and that the photographs in the calendars showed Mr. Dudgeon's family members engaged in "normal mundane family activities engaged in by typical conservative American families, e.g., dinners, picnics, family get-togethers, birthday observances, etc." ECF No. 47, p. 25 (Attachment 1 - Declaration of Dawn Kaufman). Ms. Kaufman states that none of the photographs contained anything sexually explicit or violent. *Id.* On April 13, 2008, Ms. Kaufman mailed to Mr. Dudgeon a copy of the 2008 family calendar. Mr. Dudgeon received the calendar without incident and told her that it lifted his morale to maintain visual contact with his children, grandchildren and great grandchild. *Id.*, p. 25. On January 7, 2009, Ms. Kaufman mailed to Mr. Dudgeon a copy of the 2009 calendar and received a similar acknowledgement from Mr. Dudgeon. *Id.*, p. 26.

On January 24, 2010, Ms. Kaufman mailed to Mr. Dudgeon a copy of the 2010 family calendar. She states that the 2010 calendar is the "exact same type as the ones mailed to Plaintiff in years past. It featured the same family members engaged in essentially the same activities and in the same general dress and scenes." ECF No. 47 (Kaufman Decl.), p. 26. This time however, she received a telephone call from Mr. Dudgeon stating that he had been refused permission to possess the calendar. *Id.*

REPORT AND RECOMMENDATION- 2

**B.     SCC Mail Policies 202 and 208**

Dr. Carey Sturgeon, SCC's Clinical Director, states that it is SCC policy to review photographs that come into SCC to ensure they are not detrimental to the treatment environment. Pursuant to SCC Policy 208, Sexually Explicit, Violent and Related Material, SCC prohibits residents from possessing or viewing representations of persons identified as being in an individual resident's victim range/profile(s) and images of past victims.  ECF No. 13 (Declaration of Carey Sturgeon), ¶¶ 1-3.  SCC mail room staff inspect all incoming mail and packages to ensure they comply with all SCC policies.  Pursuant to SCC Policy 202, Resident Postage, Packages, Mail and Internal Distribution, mail room staff scan the mail in the presence of the resident and conduct a cursory review for the purposes of ascertaining if the content is unauthorized or contraband.  The act of scanning personal mail consists of a staff member flipping through the pages, spending no longer than 15 seconds per page.  ECF No. 14 (Declaration of Cathi D. Harris), ¶¶ 1-4.

If the mail in question contains photographs, mail room staff will hold the item to allow the Clinical Director or the Psychology Associate for the resident's unit to decide whether the item is appropriate for the resident to possess.  SCC's mail policy is designed to prohibit contraband and counter-therapeutic material from entering the institution.  ECF No. 14 (Harris Decl.), ¶¶ 5-6.

Mr. Dudgeon contends that it is "virtually impossible for contraband to be introduced into the SCC by way of mail to a resident" and the only way to introduce such contraband would be through the cooperation of an SCC staff member.  ECF No. 47, p. 4.  According to Cathi Harris, SCC's Associate Superintendent, SCC historically has had problems with contraband images being introduced into the institution.  The Inspection of Care Committee (an independent outside

monitoring body for SCC) has identified the availability of contraband in SCC as a problem the program must address. SCC's mail search policy is an integral part of the plan to inhibit the introduction of contraband. ECF No. 14 (Harris Decl.), ¶¶ 7-8. Scanning the mail deters the introduction of contraband onto the living units and is required to ensure the safety of staff and residents. In circumstances where material may be counter-therapeutic, the SCC applies a conservative standard knowing that any material allowed within the confines of the facility might be spread to others. There is no ready alternative to scanning the mail to ensure people do not send contraband and counter-therapeutic material into the facility. *Id*. at ¶¶ 9-11.

SCC clinical staff determined, in their professional judgment, that it is counter-therapeutic for sexually violent predators in a total confinement facility to possess pictures or media that depict their victim range or profile because these materials may be used for masturbation purposes and reinforce their deviant sexual interests. This is especially problematic for residents who are not addressing and attempting to manage their deviant sexual interests by participating in treatment. ECF No. 13 (Sturgeon Decl.) at ¶ 4. Throughout his confinement at the SCC, Mr. Dudgeon has refused to be part of any treatment program. ECF No. 47, p. 4.

Melissa Green is Mr. Dudgeon's Program Area Manager. ECF No. 11 (Declaration of Melissa Green), ¶ 1. She manages the residential care and clinical treatment for the residents living in area 3; supervises and evaluates subordinate staff; consults with other key SCC managers including the Clinical Director, Residential Services Manager, Health Services Administrator, and the Facilities and Support Services Administrator; works directly with male and female residents, including individuals with personality disorders, major mental illnesses, and developmental delays; and, assesses and manages emergency situations. *Id.* As part of her

duties, she frequently consults with Psychology Associate Joseph Mitrovitch to review photos received by residents in the mail.  *Id.*, ¶ 4.

**C.    Decision to Deny 2010 Calendar**

The decision to not allow Mr. Dudgeon to keep the calendar was a treatment decision. Ms. Green met with Psychology Associate Joseph Mitrovitch and considered Mr. Dudgeon's offense history to determine whether it was appropriate for Mr. Dudgeon to possess the calendar. Specifically, Ms. Green reviewed Mr. Dudgeon's New Admission Profile.  ECF No. 11 (Green Decl.), ¶¶ 3-5.   A New Admission Profile (NAP) is a document put together by a clinical staff member (i.e., a psychologist or psychology associate) when a resident is initially transferred to the SCC.  The NAP contains basic information about a new resident such as their date of birth and county where the State filed the civil commitment petition.  It also includes a short narrative of the resident's sex offender history, prior diagnoses, and any prior treatment.  ECF No. 13 (Sturgeon Decl.), ¶ 5.

Mr. Dudgeon's NAP indicates that Mr. Dudgeon began molesting a girl who would become his stepdaughter, when she was 8 years old, that the abuse continued for 14 years, and that Mr. Dudgeon was subsequently charged and sent to prison for this offense.  The NAP also indicates that Mr. Dudgeon raped a 14 year-old girl who was a family friend and that he was also convicted and sentenced to jail for this offense.  ECF No. 11 (Decl. of Green), ¶¶ 6-7.

According to Mr. Dudgeon, the NAP contains "false, uncharged, unsubstantiated allegations."  He states that he has never been charged or convicted of any offense of any nature with anyone under the age of 14 or over 24 years of age.  ECF No. 47, p. 11.  In support, he provides an affidavit of his stepdaughter and his wife, stating that Mr. Dudgeon did not meet his wife until 1983, just before his wife's youngest daughter turned 10 years old.  ECF No. 47, pp.

REPORT AND RECOMMENDATION- 5

28-29 (Attachment 2 - Declaration of Christine Spivey and M. Claudine Dudgeon). According to the Washington Court of Appeals, Mr. Dudgeon started living together with the victim (M.S.) and the victim's mother in 1987, and that he sexually assaulted M.S. on December 30, 1997. *State v. Dudgeon*, No. 27986-0-II, 115 Wash.App. 1001, Not Reported in P.3d, 2003 WL 116180 (Wash. App. Div. 2 January 10, 2003) (unpublished).

Second, Mr. Dudgeon claims that the prison term referred to in the NAP is incorrectly linked to the molestation charge of his stepdaughter, instead of the indecent liberties charge that occurred on or about December 30, 1997, with a 24 year old female. In support, Mr. Dudgeon attaches a copy of a Judgment and Sentence reflecting that he was found guilty on July 24, 2001 of two counts of indecent liberties with forcible compulsion, which occurred on or about December 30, 1997. ECF No. 47, p. 30 (Attach 3). This date coincides with the third degree rape and indecent liberties charge relating to Mr. Dudgeon's step-daughter, M.S., referred to above. Washington state court records reflect that the State charged Mr. Dudgeon with third degree rape and indecent liberties with forcible compulsion on May 21, 1999 for the sexual assault and rape of his step-daughter, M.S., on December 30, 1997. The jury convicted Mr. Dudgeon of indecent liberties, but it did not reach a verdict on the rape charge. *Id.*, see also Case No. 09-5299 FDB/KLS (ECF No. 12, Exh. 7, p. 2). That conviction was confirmed. *State v. Dudgeon*, No. 27986-0-II, 115 Wash.App. 1001, Not Reported in P.3d, 2003 WL 116180 (Wash. App. Div. 2 January 10, 2003) (unpublished).

In July 2008, the Washington State Appellate Court held that the jury heard sufficient evidence (including testimony from six of his alleged victims that he raped and molested on hundreds of occasions from the early 1970s through the late 1990s) to reach its conclusion that Mr. Dudgeon was incarcerated for a sexually violent offense and was likely to reoffend in a

REPORT AND RECOMMENDATION- 6

predatory manner. *State v. Dudgeon,* 146 Wash.App. 216, 189 P.3d 240 (Wash.App. Div. 2, July 29, 2008).

Third, Mr. Dudgeon states that the NAP falsely states that Mr. Dudgeon raped a 14 year old when the intercourse was actually consensual. ECF No. 47, p. 3. He attaches Page 3 from a document entitled "Sex Offender PSI – Dudgeon, Cecil," reflecting three convictions for "Unlawful Intercourse," from July 1, 1983 through January 7, 1984." ECF No. 47, p. 31 (Attachment 4).

**D.      Denial of 2010 Calendar**

The calendar contained photos of (1) two young girls, approximately 7 or 8 years of age, dressed in what Ms. Green would describe as "Easter Sunday" type dresses; (2) a number of teenage girls sitting at a table in a restaurant; and, (3) two young college aged women outside. Based on Mr. Dudgeon's offense history and her consultation with Mr. Mitrovitch, it was Ms. Green's professional judgment that the photos violated SCC policy because they were representations of persons identified as being in Mr. Dudgeon's victim range and profile. It was her professional judgment that the photos were inappropriate and counter-therapeutic for Mr. Dudgeon to possess. ECF No. 11 (Decl. of Green), ¶¶ 8-9.

Joseph Mitrovich, is a Psychology Associate at the SCC. He serves as a program area specialist in sex offender treatment, which includes facilitating treatment team meetings, providing guidance in treatment plan development and intervention, and reviewing the appropriateness of media requests. He also facilitates sex offender specific treatment groups and provides individual case management. ECF No. 12 (Declaration of Joseph Mitrovich), ¶ 1.

Mr. Mitrovich states that the decision to deny the calendar to Mr. Dudgeon was a treatment decision based on his meeting with Melissa Green, his review of Mr. Dudgeon's

REPORT AND RECOMMENDATION- 7

offense history, most recent Annual Review (AR), and review of the photographs. ECF No. 12 (Mitrovich Decl.), pp. 2-7. The AR is a document generated on an annual basis by a psychologist from SCC's Forensic Services Unit, and contains among other things, the resident's diagnosis, a discussion on their progress in treatment if applicable, their behavior at the institution over the past year, and an opinion as to whether the resident still meets the statutory criteria as an Sexually Violent Predator (SVP). ECF No. 13 (Decl. of Sturgeon), ¶ 6.

Although he does not remember specific photographs, he does remember that the calendar contained one or more pictures of young girls fitting Mr. Dudgeon's victim profile. ECF No. 12 (Decl. of Mitrovich), ¶ 8. It is Mr. Mitrovich's professional opinion that the photos violated SCC policy because they were representations of persons identified as being in Mr. Dudgeon's victim range and profile and that the photos were inappropriate and counter-therapeutic for Mr. Dudgeon to possess. *Id.*, ¶ 9. Mr. Mitrovich was also concerned about Mr. Dudgeon possessing the calendar because Mr. Dudgeon does not participate in sex-offender treatment and therefore, Mr. Mitrovich did not know if the photos would be triggers for Mr. Dudgeon or how he would use them. *Id.*

Mr. Dudgeon states that he has received similar photographic images of his family in the past, possession of these photographs have caused no safety issues, security breaches, or "triggers" to precipitate counter-therapeutic behavior or incidents. He has also not passed the family photos around to any other resident. ECF No. 47, p. 6.

In Ms. Harris' professional judgment, SCC needs to scan incoming mail to ensure the security of the SCC. Scanning the mail deters the introduction of contraband onto the living units and is required to ensure the safety of staff and residents. In circumstances where material may be counter-therapeutic, SCC applies a conservative standard knowing that any material

REPORT AND RECOMMENDATION- 8

allowed within the confines of the facility might be spread to others.  There is no ready

alternative to scanning the mail to ensure people do not send contraband and counter-therapeutic

material into the facility.  ECF No. 14 (Harris Decl.), ¶¶ 9-11.

SCC has a resident grievance procedure which allows residents to appeal decisions if

they think SCC erroneously applied a policy.  Mr. Dudgeon could have filed a grievance arguing

Ms. Green and Mr. Mitrovitch erroneously applied the policy and he should be allowed to have

the calendar.   ECF No. 14 (Harris Decl.), ¶¶ 12-13.  Mr. Dudgeon maintains that he did grieve

by "making concerted efforts to resolve the issue administratively at the senior administrative

levels within the Washington State Special Commitment Center (SCC), the Department of Social

and Health Services (DSHS), and the Department of Health."  ECF No. 47, p. 2 (citing

attachments to ECF No. 2).

Kelly Cunningham, Superintendent of SCC, encouraged Mr. Dudgeon to speak with his

Residential Program Manager and the Program Psychology Associate to discuss which types of

family pictures could be approved so that his family could design a calendar collage of

acceptable family pictures.  ECF Nos. 10-3, 10-4, 10-5.

**STANDARD OF REVIEW**

The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a).  The moving party has the initial burden of production to demonstrate the absence

of any genuine issue of material fact.  *Playboy Enterprises, Inc. v. Netscape Communications

Corp.*, 354 F.3d 1020, 1023-24 (9th Cir. 2004).  A nonmoving party's failure to comply with

local rules in opposing a motion for summary judgment does not relieve the moving party of its

REPORT AND RECOMMENDATION- 9

affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001). This is true even when a party appears *pro se*. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

Where the nonmoving party is *pro se*, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

REPORT AND RECOMMENDATION- 10

**DISCUSSION**

Mr. Dudgeon does not dispute Defendants' "legitimate right to screen incoming resident mail," including his own mail. ECF No. 47, p. 8. Rather, he claims that he has a well-established First Amendment right to receive his family calendar as he has been permitted to do in the past, without "unwarranted governmental interference." *Id.* Mr. Dudgeon argues that he should not be denied the 2010 family calendar – or any future family calendars – merely because different SCC staff made speculative assumptions. *Id.* Mr. Dudgeon also argues that the refusal to allow him to possess the 2010 calendar was based on false allegations contained in his criminal record. To the extent Mr. Dudgeon is asserting that he did not commit the crimes for which he was convicted and/or committed to the SCC, such a claim is more properly reserved for a petition for writ of habeas corpus and will not be addressed here. *See, Preiser v. Rodriguez,* 411 U.S. 475, 489-90 (1973) (When a person confined by the state is challenging the very fact or duration of his physical confinement and the relief he seeks will determine whether he is or was entitled to immediate or speedier release from confinement, his sole remedy is a writ of habeas corpus.)

Mr. Dudgeon's denial of his criminal history is not relevant to whether Defendants exercised professional judgment in relying on that history to identify Mr. Dudgeon's victim profile. Even if the Court assumes that Mr. Dudgeon's victims were limited to young women aged 14 to 24 (*see* ECF No. 47, p. 11), the issue here is whether the Defendants violated his First Amendment rights in denying him access to the 2010 calendar that featured young girls and women within his victim range/profile. In *Turner v. Safley,* the Supreme Court set forth the test for evaluating restrictions on the First Amendment rights of prisoners. Although Mr. Dudgeon is

REPORT AND RECOMMENDATION- 11

not a prisoner, cases involving prisoner's rights are instructive as applied to civilly detained persons.

## A.    The *Turner* Factors

When reviewing a detention facility's restrictions of constitutional rights that are inconsistent with incarceration, the Supreme Court directs courts to consider whether the challenged restriction was "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). The *Turner* Court provided four factors to guide reviewing courts in applying this test:  (1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the existence of alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation (the presence of obvious easy alternatives may evidence the opposite). *Turner*, 107 S.Ct. at 2262.

The Ninth Circuit has noted that not all four factors will be relevant to each case; for example, the second *Turner* factor - availability of other avenues for exercising the right infringed upon - is much more meaningful in the first amendment context than the fourth or eighth, where the right is to be free from a particular wrong. *Michenfelder v. Sumner*, 860 F.2d 328, 331 n.1 (9th Cir. 1988). On the other hand, the first factor "'looms especially large because it 'tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions.'" *Id.* If a policy fails the first prong, the court need not address the other factors. *Ashker v. California Department of Corrections*, 350 F.3d 917, 923 (9th Cir. 2003). The Supreme Court has made clear that the burden "is not on the State to prove the validity of prison

REPORT AND RECOMMENDATION- 12

regulations but on the prisoner to disprove it."  *Overton v. Bazzetta*, 539 U.S. 126, 132, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003), *petition for rehearing denied*, 539 U.S. 982, 124 S. Ct. 35, 156 L. Ed. 2d 693 (2003).

In considering these factors, the court should defer to "the informed discretion of corrections officials."  *Id.* at 90, 107 S. Ct. 2254.  *Bull v. City and County of San Francisco*, 595 F.3d 964, 971 (9th Cir. 2010).  Evaluation of the penological objectives is committed to the considered judgment of administrators who are actually charged with and trained in the running of the particular institution under examination.  *O'Lone*, 482 U.S. at 359.  The *Turner* analysis applies equally to facial and "as applied" challenges.  *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004).

## 1.    Legitimate Governmental Interest

Under SCC's mail policy, the contents of all incoming mail and packages are scanned in the presence of the resident.  Scanning consists of a staff member flipping through the pages, spending no longer than 15 seconds per page, to determine that the content does not contain contraband.  The availability of contraband is a problem within SCC and SCC's mail search policy is an integral part of the plan to inhibit the further introduction of contraband into the SCC.  It is the professional judgment of SCC officials that scanning incoming mail is necessary to ensure the security of the SCC; it deters the introduction of contraband onto the living units; and, is required to ensure the safety of staff and residents.  Where material may be counter-therapeutic, it is necessary to apply a conservative approach as any material allowed within SCC can be shared with other residents.  ECF No. 14, ¶¶ 4, 6-10.

Courts have determined that ensuring security and order at an institution is a permissible non-punitive objective, whether the facility houses pretrial detainees, convicted inmates, or both.

REPORT AND RECOMMENDATION- 13

*Bell v. Wolfish*, 441 U.S. 520, 561, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). "[C]entral to all other corrections goals is the institutional consideration of internal security within the correctional facilities themselves." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977) (citing *Pell v. Procunier*, 417 U.S. 817, 823, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)). "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 559.

SCC has submitted evidence of a valid, rational connection between its mail scanning policy and its interest in preventing contraband and counter-therapeutic material from entering SCC. As noted above, Mr. Dudgeon does not challenge the constitutionality of SCC's mail scanning policies or SCC's right to scan his incoming mail. He argues, however, that there is no valid, rational connection between the denial of the 2010 calendar and SCC's stated legitimate interests because there is no proof that the photographs contained in the 2010 calendar are any different than those he received in the past without incident. He also claims that SCC officials relied on false information in his criminal history report in determining the age range of his victims and claims that none of the photographs depicted anyone between the ages of 14 and 24. ECF No. 47, p. 2.

The district court must draw all justifiable inferences in the prisoner's favor by distinguishing between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, the court's inferences must accord deference to the views of prison authorities. *Beard v. Banks,* 548 U.S. 521, 126 S.Ct. 2572, 2578 (2006) (citing *Overton, supra*). Unless a prisoner can point to sufficient evidence showing the policy is not reasonably related to legitimate penological objectives to allow him to prevail on the merits, he cannot prevail at the

REPORT AND RECOMMENDATION- 14

summary judgment stage.  *Id.*   In this case, the undisputed facts are sufficient to meet Defendants' burden to establish a rational common-sense connection between its mail policies and stated objectives.  This Court previously determined that it is self-evident that without a mail scanning policy, people outside the SCC could send contraband, weapons, and counter-therapeutic material through the mails and into the facility.  ECF No. 19, p. 10.

Even assuming that Mr. Dudgeon received family photographs in the past and that the 2010 calendar contained photographs of no one between the ages of 14 and 24, Mr. Dudgeon has presented no evidence to rebut the rational connection between SCC's mail policies and preventing contraband or counter-therapeutic materials from entering SCC through the mails.  There is nothing to rebut the undisputed evidence that SCC officials have a legitimate non-punitive policy requiring its staff to scan all mail, which would include the 2010 calendar and any subsequent photographic calendars addressed to Mr. Dudgeon.  As discussed more fully below, there is also no evidence to rebut the undisputed facts that the decision to withhold the 2010 calendar was not based on the professional judgment of SCC officials.   Accordingly, SCC meets the first prong of the *Turner* test.

## 2.    Alternative Means of Exercising the Right

Mr. Dudgeon seeks to exercise his First Amendment right to correspond with his family and continue to receive family photographs as he has done in the past.  He argues that the ready alternative means is to simply let him continue to receive future calendars without interference. The argument is specious.  The Court will not assume that any calendars and/or photographs that will be sent to Mr. Dudgeon in the future will not contain contraband or counter-therapeutic materials – that determination must be left to the professional judgment of SCC officials.  In addition, there is no evidence that SCC's mail policy prevents Mr. Dudgeon from corresponding

with his family or bans all family photographs.  Instead, the policy bans representations of persons identified as being in an individual resident's victim range or profile.

Mr. Dudgeon now argues that SCC has "broadened their scope of oppressive censorship" by withholding a newspaper article depicting a photographic image of his teenage grandson and 56 year old niece.  ECF No. 47, p. 14.   Although SCC initially held the photographs, they were returned to his possession.  *Id.*  This evidence demonstrates that Mr. Dudgeon is able to correspond and receive family photographs.   The evidence also reflects that SCC Superintendent Cunningham encouraged Mr. Dudgeon several times to meet with his program area manager and psychology associate to discuss what types of family photos SCC could approve for Mr. Dudgeon to have in his possession.  ECF Nos. 10-3, 10-4, and 10-5.  Mr. Dudgeon does not dispute this or provide evidence that he was prohibited from meeting with SCC officials to discuss the types of family photos that are appropriate.

**3.       Impact of Accommodation; Allocation of Resources**

This Court has previously found it to be self-evident that without a mail scanning policy, people outside the SCC could send contraband, weapons, and counter-therapeutic material through the mails into the facility.  ECF No 19, p. 10.  The Court has taken judicial notice that the introduction of such material would have a detrimental impact on SCC residents and staff.  In particular, counter-therapeutic material can be shared with other residents within the SCC, undermining therapy efforts.  As noted below, there is no ready alternative to scanning the mail that will prevent this introduction of contraband, weapons, and counter-therapeutic materials into the SCC.

### 4. Absence of Ready Alternatives

SCC's Associate Superintendent, Cathi D. Harris, states that there is no ready alternative to scanning the mail to ensure people do not send contraband and counter-therapeutic material into the institution. ECF No. 14, ¶ 11. Mr. Dudgeon provides no ready alternatives. Defendants have raised legitimate security concerns – the presence of contraband within SCC and the introduction of contraband through incoming mail. Thus, SCC's mail policies are reasonably related to SCC's interest in maintaining security and it is irrelevant whether a particular scan or rejection of a mail item may be deemed to be unconstitutional.

The *Turner* factors favor the SCC Defendants. Because there is evidence that the decision to not allow Mr. Dudgeon to keep the calendar was a treatment issue, the Court also looks to the deferential professional judgment standard enunciated in *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982).

## B. Exercise of Professional Judgment

In *Youngberg*, the Supreme Court first recognized that involuntarily committed persons have a constitutional right to "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg*, 457 U.S. at 319. The Court cautioned, however, against imposing expansive obligations on the states in their care of such persons as "'the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.'" *Id.* at 321. The *Youngberg* court also explained that interference by the federal judiciary with the internal operations of these institutions should be minimized and that a decision, if made by a professional, is presumptively valid. *Id.* "[L]iability may be imposed only when the decision by the professional is such a substantial

REPORT AND RECOMMENDATION- 17

departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 322-23.

Professional judgment can be based on formal education, training, or experience. *Id.*, 323 n.30 and Federal Rules of Evidence, Rule 702. The professional judgment standard refers to a decisionmaker who is "a person competent, whether by education, training or experience, to make the particular decision at issue." *Youngberg*, 457 U.S. at 323, n.30. While long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, "day-to-day decisions regarding care – including decisions that must be made without delay – necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons." *Id.*

Professional judgment can, therefore be exercised without regard to the person's possession of a particular degree. Mr. Dudgeon argues that Defendants Green and Mitrovich are not board certified psychologists and are not able to decide what photographs are inappropriate and counter-therapeutic for a resident to possess. ECF No. 47, pp. 16-19. Mr. Mitrovich is a psychology associate at SCC (ECF No. 43 ¶ 1), and Ms. Green is a program area manager (ECF Nos. 47-48 ¶ 1). Mr. Mitrovich has a master's degree in clinical psychology and is defending his dissertation this summer to receive his doctorate in clinical psychology. ECF No. 12 ¶ 2. Ms. Green has a bachelor's degree in Music Therapy and a master's degree in Healthcare Administration. She is a board certified Music Therapist and a certified Geriatric Mental Health Specialist. ECF No. 11 ¶ 2. Their job duties include frequently meeting to consider whether photographs received by residents in the mail are appropriate for the residents to possess. ECF No. 44 ¶ 4.

REPORT AND RECOMMENDATION- 18

It is SCC policy to review photos that come into the institution to ensure they are not detrimental to the treatment environment. ECF No. 13, ¶ 2. Pursuant to SCC Policy 208, Sexually Explicit, Violent and Related Material, SCC prohibits a resident from possessing or viewing representations of persons identified as being in the resident's victim range/profile(s) and images of past victims. ECF No. 13, ¶ 3. It is the professional judgment of SCC officials that it is counter therapeutic for individuals in a total confinement facility for sexually violent predators to possess pictures or media that depict their victim range or profile because these materials may be used for masturbation purposes and reinforce their deviant sexual interests. *Id.*, ¶ 4. This is especially problematic for residents who are not addressing and attempting to manage their deviant sexual interests by participating in treatment. *Id.*; ECF No. 12, ¶ 9. Mr. Dudgeon refuses to participate in treatment at the SCC. ECF No. 47, p. 4.

If mail sent to a resident contains photographs, the mail is held to allow the resident's Clinical Director or the Program Area Manager to decide whether the item is appropriate for the resident to possess. ECF No. 14, ¶ 5. In this case, Mr. Dudgeon's Program Area Manager Melissa Green, and Joseph Mitrovitch, the Psychology Associate assigned to Mr. Dudgeon, reviewed the photographs, Mr. Dudgeon's offense history, and Mr. Dudgeon's NAP and AR, to determine whether it was appropriate for Mr. Dudgeon to possess the calendar. ECF Nos. 11 and 12.

According to Ms. Green and Mr. Mitrovich, the calendar included photographs of young girls and young women of ages consistent with the victims identified in Mr. Dudgeon's NAP and AR. ECF No. 11, ¶ 9; ECF No. 12, p. 9. Specifically, Ms. Green recalls photos of two young girls approximately 7 or 8 years old, a number of teenage girls, and college age women. ECF No. 11, ¶ 8. Mr. Dudgeon's daughter, who prepared the calendars, states that the calendars

REPORT AND RECOMMENDATION- 19

contained photographs of Plaintiff's family members, including his children, grandchildren and great grandchild. ECF No. 47, p. 25. The ages of the persons included in photographs are unknown. However, Mr. Dudgeon states that all of the persons depicted in the photographs were under the age of 14 or over the age of 24 and that he was convicted for sexually assaulting a 14 year old and a 24 year old (not an 8 year old, as stated in his NAP). ECF No. 47, p. 2. It is undisputed, however, that Ms. Green and Mr. Mitrovitch reviewed the photographs, identified persons within the photographs to include 7 and 8 year olds, as well as teenage and college aged girls. The evidence also reflects that they considered the photographs in light of Mr. Dudgeon's offense history, the NAP, the AR, and Mr. Dudgeon's lack of participation in offender treatment. As to this latter consideration, Mr. Mitrovitch expressed concern that because Mr. Dudgeon does not participate in sex offender treatment, it was, therefore, unknown to them if the photos would be a trigger for Mr. Dudgeon, or how he would use them. ECF No. 12, ¶ 10.

The record reflects that SCC officials exercised their professional judgment in determining that the 2010 calendar was inappropriate and counter-therapeutic for Mr. Dudgeon to possess.

## CONCLUSION

The SCC Defendants have submitted evidence of a valid, rational connection between its mail scanning policy and its interest in preventing contraband and counter-therapeutic material from entering SCC. SCC's mail policy does not prevent Mr. Dudgeon from corresponding with his family or receiving appropriate family photographs. There is no ready alternative to scanning the mail that will prevent the introduction of contraband, weapons, and counter-therapeutic materials into the SCC and the introduction of such material would have a detrimental impact on SCC residents and staff. It is clear from the record that the SCC Defendants exercised

REPORT AND RECOMMENDATION- 20

professional judgment in determining that the 2010 calendar was counter-therapeutic to Mr. Dudgeon. Enjoining SCC from scanning Mr. Dudgeon's mail (even if limited to not scanning future calendars) could allow the introduction of contraband and other counter-therapeutic material into the facility. Mr. Dudgeon's family remains free to send him letters and photographs that do not contain counter-therapeutic images.

For the foregoing reasons, the undersigned recommends that the Court grant the SCC Defendants' Motion for Summary Judgment (ECF No. 46).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure (Fed.R. Civ. P.), the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **September 2, 2011**, as noted in the caption.

DATED this __12th__ day of August, 2011.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION- 21